UNITED STATES DISTRICT COURT
FILED
SEP 17 2025
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOHN SENKA, CAROLA DANCE, JOHN SENKA O/B/O John V. Senka
CAROLA DANCE O/B/O John V. Senka

Plaintiff's,

Vs.

ARKPORT CENTRAL SCHOOL DISTRICT

Defendant

AFFIDAVIT IN ANSWER
CIVIL ACTION NO.: 6:24-CV-06252

---

PLEASE TAKE NOTICE, Plaintiff did serve the school district to the best of their ability. The school does not publicize who the proper person for service is, so the Plaintiff served Claire Smith and Jesse Harper (See attached affidavits of service). The purpose of service is to give actual notice of the lawsuit and since they responded to the lawsuit they had actual notice.

The 1983 claim is not under respondent superior because the person involved was not a mere agent of thedistrict but actually is employed by them and therefore the district is responsible for what they do. It is a result of district policy set forth in the plaintiffs medical complaint, and therefore is a 1983 claim. (SeePage 33 Paragraph L,M that identifies the district policy.)

J.S's first amendment rights were violated because he was punished for free speech off of school property when he was not on a school function. The punishment is unjust because his comments were not racist by any reasonable standard. Article 11 Section 1 of the New York State Constitution guarantees children an education. J.S. was deprived of education during the period of suspension. There are questions of fact and dispute and the case should be decided on the merits.

The Plaintiff's pleadings are not conclusions but the Plaintiff has set out factual allegations that due in fact suggest entitlement relief. From the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day. That means courts must be more skeptical of a school administrations' efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all. When it comes to political, religious or vulgar speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention **(See. Mahanoy Area School District v.B.L., 594 U.S 2001)**
The school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus. America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas or speech, for popular ideas have less need for protection. **(See Tinker v. Des Moins School District .393 US 503 19690)** Court in practice of the well-known aphorism, "I disapprove of what you say, but I will defend to the death your right to say it.Even when students are on school premises during regular school hours, they are not stripped of their free-speech rights. Tinker teaches that expression that does not interfere

with a class (such as by straying from the topic, interrupting the teacher or other students, etc.) cannot be suppressed unless it "involves substantial disorder or invasion of the rights of others." **See Chaplinsky v. New Hampshire, 315 U. S. 568 (1942)**

A public school's regulation of off-premises student speech is a different matter. While the decision to enroll a student in a public school may be regarded as conferring the authority to regulate some off-premises speech enrollment cannot be treated as a complete transfer of parental authority over a student's speech. In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children.**( See Wisconsin v.Yoder, 406 U. S. 205, 232 (1972)** ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); **See Pierce v. Society of Sisters, 268 U. S. 510, 534–535 (1925)** (discussing "the liberty of parents and guardians to direct the upbringing and education of children under their control"). Parents do not implicitly relinquish all that authority when they send their children to a public school. As the Court notes, it would be far-fetched to suggest that enrollment implicitly confers the right to regulate what a child says or writes at all times of the day and throughout the calendar year. Any such argument would run headlong into the fundamental principle that a State "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech.

("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers"). It is unreasonable to infer that parents who send a child to a public school thereby authorize the school to take away such a critical right. (**See Tinker v. Des Moins School District .393 US 503 19690)** This is true even if the student's off-premises speech on a matter of public concern is intemperate and crude. When a student engages in oral or written communication of this nature, the student is subject to whatever restraints the student's parents impose, but the student enjoys the same First Amendment protection against government regulation as all other members of the public. Speech cannot be suppressed just because it expresses thoughts or sentiments that others find upsetting (**See Tinker v. Des Moins School District .393 US 503 19690)**

**J.S.**In relation to J.S's off campus speech the school did not stand in Locus Parentis, therefore the his governing of **J.S's** behavior falls unarguably with his parents as J.S had been dismissed from school that dy 5 hours before the the incident occured, and was in no way part of the school function (**See. Mahanoy Area School District v.B.L., 594 U.S 2001**

The Plaintiff's have in fact identified the employees responsible by name and factual claims. The malicious prosecution was clear because there was no foundation for it, as the child did not do anything wrong and was not on school property and was not participating on the school trip, yet he was still punished and that is why the very nature is malicious. The notice of claim was clearly filed with the school and responsible parties. The slander claim is adequately led because they claim the child was a racist and calling someone racist and or saying they said racist remarks is inherently slanderous and no further information is necessary.

Subscribed and sworn to before me
This 12 day of September 2025
Danielle Cook
Notary Public

Dated: September 12th, 2025 at Bath , New York.

DANIELLE ASHLEY COOK
Notary Public, State of New York
Reg. No. 01CO0011982
Qualified in Steuben County
Commission Expires August 15, 20 27

[signature] Date 9-12-25, 2025
John Senka

Carola Dance Date 9.15.2025, 2025

Carola Dance

State of New York
County of Steuben
On the 15th day of September in the year 2025 before me the undersigned, a Notary Public in and for said state, Personally appeared Carola Dance, Personally known to me or proved to me on the basis of satisfactory evidence to be the individual, whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity and that by her signature on the instrument, The individual, executed this instrument.

Amy M A Gardiner
Notary Public, State Of New York
Reg. No. 01GA6425485
Qualified in Steuben County
My Commission Expires Nov. 22, 2025

Amy M.A. Gardiner

(f) Disrespect toward a faculty member.
(g) Possession or use of a weapon, which constitutes a firearm or destructive device, on school premises. School premises include school grounds, school buildings, or a school bus.
(h) Possession or use of knives or other weapons not included in section (g) on school premises. School premises include school grounds, school buildings, or a school bus.
(i) Failure to comply with the directions of a teacher, administrator or other school employee.
(j) Engaging in acts of sexual harassment as defined in the District's sexual harassment policy.
(k) Provisions prohibiting discrimination and harassment against any student, by employees or students on school property or at a school function, that creates a hostile environment by conduct, with or without physical contact and/or verbal threats, intimidation or abuse, of such a severe nature that:
   i. has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional and/or physical well-being; or
   ii. reasonably causes or would reasonably be expected to cause a student to fear for his/her physical safety.
(l) Such conduct shall include, but is not limited to, threats, intimidation, or abuse based on a person's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practices, disability, sexual orientation, gender as defined in Education Law Section 11(6), or sex; provided that nothing in this subdivision shall be construed to prohibit a denial of admission into, or exclusion from, a course of instruction based on a person's gender that would be permissible under Education Law Sections 3201-a or 2854(2) (a) and Title IX of the Education Amendments of 1972 (20 USC Section 1681, et seq.), or to prohibit, as discrimination based on disability, actions that would be permissible under 504 of the Rehabilitation Act of 1973.
(m) Using in either words, clothing, or signs, profane, lewd, vulgar, abusive language or words that may incite or offend another person.
(n) Selling, using or possessing obscene material.
(o) Lateness for, missing or leaving, school or class without permission of a staff member.
(p) Any willful act which, disrupts the normal operation of the school community.
(q) The use, possession, sale or gift of a cigarette, cigar or pipe, chewing or smokeless tobacco, or substitute/electronic cigarette on school premises (including buildings or grounds) or on a bus going to or from a school function or a school-sponsored function.
(r) Disrupting the educational process.
(s) Interfering with the teacher's authority over the classroom.
(t) Acting as a violent pupil.
(u) Vandalizes school property or the property of a student or staff member.
(v) Violates the civil rights of another student.
(w) Violates the district's dress code.

The range of penalties that may be imposed for the conduct set forth above is as follows:

(1) Verbal warning;
(2) Written warning;
(3) Written notification to parent;
(4) Counseling;
(5) Probation;
(6) Reprimand;
(7) Detention;
(8) Suspension from transportation;
(9) Suspension from athletic participation;
(10) Suspension from social or extracurricular activities;
(11) Suspension of other privileges;

STATE OF NEW YORK STIEUBEN COUNTY

SUPREME COURT

IN THE MATTER OF THE CLAIM OF NOTICE OF CLAIM JOHN SENKA, CAROLA DANCE, JOHN J. SENKA O/B/O CAROLA DANCE O/B/O JOHN V. SENKA, JOHN V SENKA

vs

ARKPORT CENTRAL SCHOOL DISTRICT

INDEX NO: 2024-0398CV

AFFIDAVIT OF SERVICE

STATE OF NEW YORK, COUNTY OF STEUBEN:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides in the State of NY.

On APRIL 10, **2024** at 10:00 **AM/PM** at 35 EAST AVE ARKPORT, NY 14807

deponent served a

- ☐ SUMMONS ☐ WITH NOTICE
- ☒ SUMMONS & COMPLAINT
- ☐ SUBPEONA DUCES TECUM
- ☐ CITATION
- ☐ NOTICE OF PETITION & PETITION
- ☐ SUBPOENA
- ☐ RESPONDENT
- ☐ DEFENDANT ☐ WITNESS
- ☐ FOURTEEN DAY NOTICE
- ☐ THIRTY DAY NOTICE
- ☐ NINETY DAY NOTICE
- ☐ WARRANT OF EVICTION
- ☐ OTHER ____________

on CLAIR SMITH / PRINCIPAL

Individual 1. ☒ by delivering a copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein

Corporation 2. ☐ a ____________ corporation, by delivering thereat a true copy *of each* to ____________ personally, deponent knew said corporation so served to be the corporation described in same as said recipient and knew said individual to be ____________ thereof.

Suitable Age Person 3. ☐ by delivering thereat a true copy *of each* to ____________ a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state

Affixing to Door, etc. 4. ☐ by affixing a true copy of *each* to the door of said premises, which is recipient's [ ] actual place of business [ ] dwelling place [ ] usual place of abode within the state. Deponent was unable, with due diligence, to find recipient or a person of suitable age and discretion thereat, having called there:

On ____________, 2024 at ________ On ____________, 2024 at ________

On ____________, 2024 at ________ On ____________, 2024 at ________

Description ☒

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Male | ☒ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☐ Black Skin | ☒ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0" – 5'3" | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☒ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☐ 51-65 Yrs. | ☐ 5'-9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☒ Glasses | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

Other identifying features:____________

## - MAILING -

On ____________, 2024, deponent mailed a copy of the above document to ____________ at ____________. The document was enclosed in a First Class postpaid properly addressed envelope not indicating that the mailing was from an attorney or concerned legal action and marked "PERSONAL AND CONFIDENTIAL" in an official depository under the exclusive care and custody of the United States Post Office. In addition, a copy was also mailed to ____________ by certified mail at the given address, certified mail, receipt number: ____________.

Military Service Upon information and belief, I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on April 10, 2024

Susan M. McMaster

Notary Public

SUSAN M. MCMASTER
Notary Public State of New York
Qualified in Livingston County
Lic. #01MC4956772
Commission Expires October 2, 2025

Susan M. Peters

SUSAN M. PETERS

STATE OF NEW YORK STEUBEN COUNTY
SUPREME COURT
IN THE MATTER OF THE CLAIM OF NOTICE OF CLAIM
JOHN SENKA, CAROLA DANCE, JOHN J. SENKA O/B/O CAROLA DANCE O/B/O JOHN V. SENKA, JOHN V SENKA
VS
ARKPORT CENTRAL SCHOOL DISTRICT

INDEX NO: 2024-0398CV

AFFIDAVIT OF SERVICE

STATE OF NEW YORK, COUNTY OF STEUBEN:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides in the State of NY.

On APRIL 10, **2024** at 10:00 **AM/PM** at 35 EAST AVE ARKPORT, NY 14807

deponent served a

- ☐ SUMMONS ☐ WITH NOTICE
- ☒ SUMMONS & COMPLAINT
- ☐ SUBPEONA DUCES TECUM
- ☐ CITATION
- ☐ NOTICE OF PETITION & PETITION
- ☐ SUBPOENA
- ☐ RESPONDENT
- ☐ DEFENDANT ☐ WITNESS
- ☐ FOURTEEN DAY NOTICE
- ☐ THIRTY DAY NOTICE
- ☐ NINETY DAY NOTICE
- ☐ WARRANT OF EVICTION
- ☐ OTHER ______

on JESSE HARPER / SUPERINTENDANT

Individual 1. ☒ by delivering a copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein

Corporation 2. ☐ a ______ corporation, by delivering thereat a true copy *of each* to ______ personally, deponent knew said corporation so served to be the corporation described in same as said recipient and knew said individual to be ______ thereof.

Suitable Age Person 3. ☐ by delivering thereat a true copy *of each* to ______ a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state

Affixing to Door, etc. 4. ☐ by affixing a true copy of *each* to the door of said premises, which is recipient's [ ] actual place of business [ ] dwelling place [ ] usual place of abode within the state. Deponent was unable, with due diligence, to find recipient or a person of suitable age and discretion thereat, having called there:

On ______, 2024 at ______ On ______, 2024 at ______

On ______, 2024 at ______ On ______, 2024 at ______

Description ☒

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ Male | ☒ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Black Skin | ☒ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0" – 5'3" | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☒ 36-50 Yrs. | ☐ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☐ 51-65 Yrs. | ☐ 5'-9"-6'0" | ☒ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | ☒ Over 6' | ☐ Over 200 Lbs. |

Other identifying features: ______

## - MAILING -

On ______, 2024, deponent mailed a copy of the above document to ______ at ______. The document was enclosed in a First Class postpaid properly addressed envelope not indicating that the mailing was from an attorney or concerned legal action and marked "PERSONAL AND CONFIDENTIAL" in an official depository under the exclusive care and custody of the United States Post Office. In addition, a copy was also mailed to ______ by certified mail at the given address, certified mail, receipt number: ______.

Military Service Upon information and belief, I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on April 10, ~~2006~~ 2024 SMM

Susan M. Peters
SUSAN M. PETERS

Susan M. McMaster
Notary Public

SUSAN M. MCMASTER
Notary Public State of New York
Qualified in Livingston County
Lic. #01MC4956772
Commission Expires October 2, 2025

Original APPEAL TO School.

Prior to my written appeal it is important to establish a few terms:

The term ***in loco parentis***, "in the place of a parent", refers to the legal responsibility of a person or organization to take on some of the functions and responsibilities of a parent.

The term "**school function**" is defined as: All events sponsored by the school district, including for example, extra-curricular activities such as sporting events, dances and theatrical events. Students are at a school function and therefore subject to the district's code of conduct whenever they are at any place **as part of their assigned school activities**. For example, this includes classes at BOCES or other campuses, as well as class field trips and any event in which the student is participating **as a student** of the school district.

On Friday January 12, 2024 my son Johnny was dismissed early from school at approximately 2pm that day, picked up by myself and taken off campus. My son spends 3-4 days a week at Swain Ski Center. We own the campground across the street and stay from Friday to Sunday most weekends and all week during breaks. On that day my son had been skiing for hours prior to the ACS ski club's arrival. He has not participated with the AC ski club for 2 years due to prior unfair treatment. On that day it is unarguable that my son was not acting or participating as an ACS student as per your student handbook definition.

The Administration's position on the matter tells me that it clearly does not understand the doctrine that grants the school authority over its students. That doctrine is ***loco Parentis.*** The school has no authority to discipline my son when this special relationship does not exist. My son was my responsibility that evening on the ski slope, not the schools. Board members: Pat, Julie, Natalie, Michelle, Tracy.. Imagine you take your son or daughter skiing on the weekend outside of a school related function and they are suspended due to violating the ACS code of conduct. Yes, any parent would feel just like my wife and I do. It has been very traumatic to our family and my son has suffered immeasurable duress and public embarrassments due to this abuse of authority. The School has obviously overstepped the scope of its authority over a student.

The school in its assertion of rules has interjected itself into the most sacred of relationships; between that of parent and child. School

Administrators will counter and argue that my son was " participating ***with*** ACS students" and therefore justified the blatant violation of my son's rights and parent's trust. Apart from not meeting the technical definition in the ACS handbook, Saying "**with**". Which is still untrue or at best misleading. The contrary is true, ACS students were if anything participating with my son who spends most of his time there all winter. The students simply shared a chairlift up the hill. Imagine you were skiing alone at Swain and happened to simply share a chairlift ride with me and my family. Would you consider yourself vacationing or skiing with us?

If Johnny had fallen off the lift that evening during the steak dinner conversation the school would **undoubtedly** shed any liability or responsibility for the fall as he was not there **as a student.** The school cannot have it both ways.

So the point of what was said by my son that night is a totally moot issue as you had no authority over him at that time. I will nevertheless address the issue of the content of his speech.

The following come from the Supreme Court findings of Levy V Mahoney. I cut and pasted some of the court documents as I could not have worded them better than eight Supreme Court Justices.

First, a school, in relation to off-campus speech, will rarely stand in loco parentis.. R The doctrine of in loco parentis treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them. **Geographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility.**

Second, from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day. That means courts must be more skeptical of a school administrations' efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all. When it comes to political, religious or vulgar speech that occurs outside school or a school program or activity, **the school will have a heavy burden to justify intervention.** That is why the lawyers worded the definition of a school function in your student code of conduct to include Participating ***"as"*** "as" a student. It is a small word with big significance. My son must have been participating ***as*** a student to meet your own definition. Anything less would constitute an overstep on the part of the school administration..

Third, the school itself has an interest in protecting a student's unpopular expression, **especially when the expression takes place off campus.** America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas or speech, for popular ideas have less need for protection. Thus, schools have a strong interest in ensuring that future generations understand the workings of MAHANOY AREA SCHOOL DIST. v. B. L. Opinion of the Court in practice of the well-known aphorism, "I disapprove of what you say, but I will defend to the death your right to say it.

The "Inappropriate things as per your report "

- While at Swain with other Arkport students who were there on a ski club visit , it was reported to one of the chaperones that Johnny had been saying **inappropriate things** on the ski lift when a student of a certain race/skin color was nearby.
- It was reported that he was asking students what they like with their steak dinner , **saying Beans, Broccoli and Corn** , along with the phrase "BBC" again.

Administration sighted that the words/phrase above violated section: I) M) and P) of the student code of conduct

(l) Such conduct shall include, but is not limited to, **threats**, **intimidation**, or **abuse** based on a person's actual or perceived race, color, weight, national origin, ethnic group, religion, religious practices, disability, sexual orientation, gender as defined in Education Law Section 11(6), or sex; provided that nothing in this subdivision shall be construed to prohibit a denial of admission into, or exclusion from, a course of instruction based on a person's gender that would be permissible under Education Law Sections 3201-a or 2854(2) (a) and Title IX of the Education Amendments of 1972 (20 USC Section 1681, et seq.), or to prohibit, as discrimination based on disability, actions that would be permissible under 504 of the Rehabilitation Act of 1973

The whole phrase and acronym were not part of any threat or intimidation. It was a question asked in private conversation regardless of the speaker's tone or volume. The question was not directed to anyone other than fellow chairlift riders and served a legitimate purpose. As per the quote in your investigative report the B.B.C reference was clearly in reference to Beans, Broccoli and Corn given the nature of the 11 year old children's conversation.

It is also unclear via the investigative report that my son asked and answered the question? When in fact there was my son Johnny Senka, Jimmy Heoffner, Corbin Strobel and Jamison Murphy. It was unfairly omitted in the investigative report as it did not support the school's narrative, all 4 of the students were involved in this steak dinner conversation, subsequently only 2 were punished? The chair lifts are 20 yards apart and it was blowing 12-15 with squalls that evening at 7pm. With no mean or threatening words of any kind spoken, and not a word directed to anyone other than those involved in the private conversation, I feel the administration would find itself very much alone in interpeting the dialog threatening, intimidating or abusive. If, as an adult I asked board member Pat Flaitz what she liked at Maddie J's and he said their Biscuts, Bacon and Coffee BBC I truly do not think your average American would find it to be threatening, abusive, inappropriate or intimidating in any way.

m) Using in either words, clothing, or signs, **profane, lewd, vulgar, abusive language** or words that may incite or offend another person

Given the response I) believe that it adequately covers M) although some people are very easily offended it must be so much so that it would interfere with their learning process. Seeing again that there was never a comment directed to any marginalized student. In this case someone was offended by a private conversation that was overheard. It was not clear if the person of a certain color was even offended vs the chaperone that it was reported to. And unclear as to who actually made the comment as there were 4 individuals involved. The strength of this anti-vulgarity interest is weakened considerably by the fact that Johnny spoke **off the school grounds, outside school time** and **not as a student**

(p) Any **willful** act which, disrupts the normal operation of the school community

My son had **No willful intentions** whatsoever to disrupt school operations. You provided **no evidence** that there was any disruption to the normal operation of the school.

I will include some summaries from eight of the Supreme Court Justices, as I could not have worded them any better.

***<u>Chaplinsky v. New Hampshire, 315 U. S. 568 (1942)</u>*** Even when students are on school premises during regular school hours, they are not stripped of their free-speech rights. Tinker teaches that expression that does not interfere with a class (such as by straying from the topic, interrupting the teacher or other students, etc.) cannot be suppressed unless it ***<u>"involves substantial disorder or invasion of the rights of others." 393 U. S., at 513.</u>***

A public school's regulation of off-premises student speech is a different matter. While the decision to enroll a student in a public school may be regarded as conferring the authority to regulate some off-premises speech (a subject I address below), enrollment cannot be treated as a complete transfer of parental authority over a student's speech. **In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children.** See Wisconsin v. Yoder, 406 U. S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); Pierce v. Society of Sisters, 268 U. S. 510, 534–535 (1925) (discussing "the liberty of parents and guardians to direct the upbringing and education of children under their control"). **Parents do not implicitly relinquish all that authority when they send their children to a public school.** As the Court notes, it would be far-fetched to suggest that enrollment implicitly confers the right to regulate what a child 10 MAHANOY AREA SCHOOL DIST. v. B. L. ALITO, J., concurring says or writes at all times of day and throughout the calendar year. Any such argument would run headlong into the fundamental principle that a State "**may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech.**

("It is firmly settled that under our Constitution the public expression of ideas **may not be prohibited** merely because the ideas are themselves offensive to some of their hearers"). **It is unreasonable to infer that parents who send a child to a public school thereby authorize the school to take away such a critical right.**

This is true even if the student's off-premises speech on a matter of public concern is intemperate and crude. When a student engages in oral or written communication of this nature, **the student is subject to whatever restraints the student's parents impose, but the student enjoys the same First Amendment protection against government regulation as all other members of the public**. Speech cannot be suppressed just because it expresses thoughts or sentiments that others find upsetting

In closing It is my belief that my is thoughtful kid and no racist intent. My son Johnny spoke under circumstances where the school **did not stand in loco parentis.** And there is no reason to believe myself or his mother had delegated to school officials our own control of Johnny's behavior at the Swain Ski center that night. Moreover, the "Inappropriate things" stated in Johnny's private conversation had purpose and . Further, the school has presented no evidence of any general effort to prevent students from using vulgarity off school grounds. Together, these facts should convince any reasonable person to see that the school's interest in teaching good manners **is not sufficient,** in this case, to Violate Johnny's most fundamental right and interest in free speech and expression.

Second, the school argues that it was trying to prevent disruption, if not within the classroom, then within the bounds of a school-sponsored extracurricular activity. But **we can find no evidence in the record of the sort of "substantial disruption" of a school activity or a threatened harm to the rights of others that might justify the school suspending my son Johnny!**

I would like to see this administration receive training/council to insure that they have an understanding of the rights afforded public school students. As importantly they must be counseled in the scope of the schools authority and standards that it used to punish its students.